IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DR. SHEELA ATHREYA § | |
| § | |
| Plaintiff, § | |
| § | CASE NO. 4:23-cv-02478 |
| v. § | |
| § | |
| § | |
| § | |
| TEXAS A&M UNIVERSITY § | |
| § | |
| Defendant. § | |

**PLAINTIFF DR. SHEELA ATHREYA'S ORIGINAL COMPLAINT**

*[Dean Malavé] makes women feel uncomfortable and unsupported. Eleven or twelve female faculty have left since his arrival and five or six specifically due to Dean Malavé's treatment.*

Statement provided August 29, 2022 to the Department of Civil Rights and Equity Investigations regarding the Dean of Texas A&M University at Qatar.

In 2020, Texas A&M University at Qatar recruited Dr. Sheela Athreya to teach anthropology at its Doha campus. When she started at the campus, she was the only woman from the main campus, the only woman with tenure, only one of two women in research-engaged positions promoted past assistant professor, and one of only four women in a research-engaged position at any rank. While her contract was for a two-year term, the contracts were always renewed if the professor wanted to stay and had the support of the main campus.

Eight days after Dr. Athreya moved her family to Doha, Qatar, Dean Malavé said he would not renew her contract. She was replaced by a man. The reasons he gave were conflicting and nonsensical. The program chair was so shocked that he filed a report of sex discrimination against Dean Malavé for his behavior. Dean Malavé then removed him from his position.

In not renewing Dr. Athreya's contract because of her sex, Texas A&M violated the law.

## I. PARTIES

1. Dr. Sheela Athreya is an individual who resides in Charlotte, North Carolina.

2. Defendant Texas A&M University is a state university located in College Station Texas. It may be served through its President, Katherine Banks, at 1246 TAMU, Texas A&M University, College Station, TX 77843.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a)(4) because Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964.

4. Venue is appropriate in the Southern District of Texas because the acts giving rise to this suit occurred in Brazos County, Texas.

## III. FACTS

5. Dr. Athreya first started working as a tenure-track assistant professor for TAMU in 2003 at the main campus in College Station.

6. In 2011, she was granted tenure.

7. Between 2019 and 2021, Dr. Athreya received two prestigious awards from Texas A&M.

8. In 2019, Dr. Athreya received the Chancellor's EDGE Fellowship. In November 2021, Dr. Athreya received notice that she has been selected by the President of Texas A&M as a Presidential Impact Fellow.

9. In 2019, she was recruited by Texas A&M University at Qatar (TAMUQ) to teach there. The dean of that campus is Dr. César Malavé.

10. TAMUQ is located in Education City in Doha, Qatar. Education City is an area of Doha containing eight universities including TAMUQ, Carnegie Mellon, Virginia Commonwealth University, Georgetown University, Weill-Cornell Medicine, HEC Paris, Hamid Bin Khalifa University, and Northwestern University.

11. Funding for TAMUQ comes from the Qatar Foundation, an arm of the Qatari government. TAMU and TAMUQ refuse to produce the contract and are even engaged in litigation to keep it secret.

12. Dr. Athreya was first contacted by Dr. Joseph Ura, the Liberal Arts Program Chair, and went through the formal search process in early 2020.

13. Dr. Athreya was very interested in this possibility because it would allow her to travel for her research more easily as it centered in that area.

14. During the recruitment process she was told that initial contracts are typically for two years, and that the renewal process is generally *pro forma*.

15. Dr. Ura shared that to his knowledge no main campus faculty who wanted to stay, and had the approval of their home department/college, been denied a contract renewal.

16. Associate Dean Dr. Ioannis Economu, during the recruitment process spoke to Dr. Athreya about how raising her kids in Qatar would make it easier for them to go to university in Europe.

17. Dean Pamela Mathews of the College of Liberal Arts advised Dr. Athreya to request a yearly contract so that she (Athreya) would be able to have more control over how long she stayed in Qatar, conveying through this that the Main Campus Liberal Arts faculty members have historically had control over the length of time they stayed in Qatar.

18. After receiving the appropriate approvals from the Dean of the College of Liberal Arts and the Head of the Anthropology Department on the main campus, Dr. Athreya began teaching Anthropology for TAMUQ in July 2020 on a two-year contract.

19. Because of the COVID pandemic, that first year, Dr. Athreya taught remotely.

20. It was considered a success. No concerns were brought to her attention regarding her position or her classes.

21. On August 3, 2021, Dr. Athreya, at considerable expense, relocated her entire family, including her husband and kids, to Doha, Qatar.

22. This was not an easy or quick move. In addition to having to obtain the appropriate visas and work permits, Dr. Athreya's family had to sell or store most of their belongings. Her husband had to make special arrangements with his employer to work remotely out of the country. Those arrangements involved quitting his job and starting his own company to be re-hired on a contract basis, without any health or retirement benefits, which he had previously received.

23. Dr. Athreya also had to uproot her children from their friends and school and enroll them in school in Doha. One her children has special needs so the decision to uproot them was not made lightly.

24. All of these actions were taken with the expectation that her contract would be renewed as many times as Dr. Athreya wanted.

25. There were even more reasons for Dr. Athreya to believe her contract would be renewed. Specifically, TAMU requires certain core classes to satisfy the social and behavioral science (SBS) core curriculum in order to receive a Texas A&M degree. Dr. Athreya's anthropology class was the only one that would meet that social sciences requirement at TAMUQ that year. No new hires had been made. Moreover, while students could take classes at other

universities within Education City, there were not enough seats at other universities that met TAMU requirements to accommodate all of the TAMUQ students that needed to meet those requirements.

26. Eight days after Dr. Athreya arrived in Doha with her family, on August 11, 2021, Dean Malavé told Dr. Ura that he had unilaterally decided he would not renew Dr. Athreya's contract next year and that as of August 2022, she would no longer work at TAMUQ.

27. Dr. Ura conveyed that news to Dr. Athreya in person later that afternoon.

28. This decision came out nowhere. In fact, at the time Dr. Malavé informed Dr. Ura of this decision, he had not even met Dr. Athreya at all.

29. He did not discuss it with the main campus or anyone else.

30. She was replaced by a male assistant professor named Dr. Aymen Elsheik.

31. Dean Malavé's decision to non-renew Dr. Athreya was also extremely unusual for two reasons.

32. First, Dr. Athreya was actively recruited based on TAMUQ's stated need for more main campus faculty, and more women. At that time, she was the only woman serving at TAMUQ from the main campus, the only woman with tenure, only one of two women in research-engaged positions (tenured/tenure track or rolling contract/track) promoted past assistant professor, and one of only four women in a research engaged position at any rank. She was also the only female member of the Faculty Advisory Council, a position to which she was elected by her Liberal Arts colleagues.[1]

---

[1] TAMU has disputed this statement in its filing with with the federal Equal Employment Opportunity Commission, stating that at the time of Dr. Athreya's hiring, Dr. Zohreh Eslami was on faculty. That is technically true, but deliberately misleading. By the time Dr. Athreya started her two-year contract in July 2020, Dr. Eslami had been forced out. Her exit interview is dated April 20, 2020.

33. Second, no main campus professor who had wanted to stay, and had the support of their home department and college, has ever been asked to leave the program.

34. TAMU later tried to dispute the fact in the previous paragraph by citing the case of Dr. Hamid Parsaei, a male tenured professor in the department of Industrial and Systems Engineering. He was non-renewed by Dean Malavé. However, any such comparison is deeply misleading. First, Dr. Parsaei's original position at TAMUQ was dissolved after his first appointment there, but he was given a reappointment and put in a different position. This is a key difference because as will be shown below TAMU argues that Dr. Athreya's position was no longer going to be needed, yet when that happened to a man, TAMUQ found a position for him. Second, after spending nine years at TAMUQ, Dr. Parsaei's home department in College Station asked him to return and start an Executive Program on the main campus and Dr. Parsaei agreed to do that. In other words, unlike with Dr. Athreya's case, the home department did not want him to stay.

35. Dr. Malavé has since offered several conflicting and nonsensical reasons for his decision to not renew Dr. Athreya's contract.

36. Dr. Malavé told Dr. Ura, that TAMUQ did not need to teach Anthropology and that instead, students could take this course at other colleges in Qatar's Education City.

37. This stated reason did not make sense because the Dean does not make program decisions.

38. On September 5th, when Dr. Malavé agreed to meet Dr. Athreya in person, he and Associate Dean Economou (who was brought into the meeting by Dr. Malavé) offered a different reason when Dr. Athreya asked for reconsideration.

39. To her, Dr. Malavé claimed that her contract could not be renewed because he did not have any more full-time positions available at TAMUQ.

40. The facts do not support this reason. According to statements made by Associate Dean Hassan Bazzi in January 2023, TAMUQ currently had six open full time faculty lines. That means there were six open positions in August of 2022. Indeed, to this day, there are open full-time faculty lines at TAMUQ. Further TAMUQ actually returns money to the Qatar Foundation each, including on one occasion during this time period, one million dollars. Dean Malavé has subsequently admitted that both of these things are true under oath.

41. Dr. Athreya was told by the main campus Dean of Liberal Arts and the Dean of Faculties offices that Dr. Malavé would not renew her contract simply because he never promised to.

42. Finally, during the hearing conducted by the Office of Risk, Ethics, and Compliance, Dean Malavé offered yet another reason. During that hearing, Dean Malavé testified that the reason he did not renew her contract was because it only ever intended to be a two-year contract. This reason is false because Dean Malavé never told any of the people who recruited Dr. Athreya that was the case, including Dr. Ura and Dr. Economou, who both spoke to Dr. Athreya about her being in Qatar long term.

43. These various reasons are simply a pretext for sex discrimination.

44. Dr. Ura, the program chair, was so dissatisfied with these reasons that he came to believe Dean Malavé non-renewed Dr. Athreya's contract because of her sex.

45. Dr. Ura then filed a Title IX complaint on September 16, 2021, regarding Dr. Athreya's non-renewal, providing numerous documents establishing the above reason were false. On September 27, 2021, Dr. Ura expressed his concerns of sexism to the Office of Risk and

Compliance. On October 18, Dean Malavé told Dr. Ura that if he did not resign his Program Chair position, he would be removed from it. When Dr. Ura refused to resign, Dean Malavé made good on his threat and removed him. Just like with Dr. Athreya for made up and nonsensical reasons. Indeed, the Equal Employment Opportunity Commission has recently issued a cause finding stating that it believes it is more likely than not that TAMUQ has engaged in retaliation against Dr. Ura.

46.     Dean Malavé and TAMUQ have a history of sex discrimination.

47.     Around the same time Dr. Malavé was telling Dr. Athreya that she would not be renewed he was attempting to fire Dr. Brittany Bounds, another female professor.

48.     While he eventually held back on the decision not to renew Dr. Bounds' contract, after Dr. Ura's consultation with the Dean of Faculties legal counsel, the pattern is clear.

49.     Despite the fact that TAMUQ serves a female majority, at the time, there was only one female Assistant Dean, the dean of Finance and Administration. There were no female Program Chairs, Academic Deans, or Directors/Executive Directors of academic support units.

50.     Since Dr. Athreya filed her charge, TAMUQ has brought over from the main campus a tenured, female professor, who will also be a dean. This appears to have been done to cover up the prior misogyny.

51.     At the time of this dispute, the number of female faculty outside of Liberal Arts had not increased in the five years since Dr. Malavé became Dean.

52.     In fact, there was unusually high turnover at TAMUQ of female faculty.

53.     Seventy percent of the female faculty hired during that time at TAMUQ have left.

54.     In the original exit interviews, these women repeatedly cited a pervasive culture of sexism, led by Dr. Malavé, as one of the reasons for their departure.

55. TAMUQ has tried to cover this up.

56. When the Women's Faculty Forum requested information from exit interviews on the high turnover, Dr. Malavé and Associate Dean Yannis Economou drafted their own summary of the exit interviews, which conveniently omitted the sexism allegations.

57. However, many of the women provided the WFF copies of the actual interviews.

58. During the investigation of Dr. Athreya's complaint, the investigator obtained several witness statements confirming that Dean Malavé and TAMUQ are sexist.

59. According to one statement:

> "I have a been here since Dean Malavé arrived and I can say it is more difficult under Dean Malavé than his predecessor. . . . [He] makes women feel uncomfortable and unsupported. Eleven or twelve female faculty have left since his arrival and five or six specifically due to Dean Malavé's treatment. We have another about to leave soon. Women with a strong voice on this campus have been let go, not had their contracts renewed or just left.

60. According to another statement:

> [Q.] Can you tell me about how Dean Malave's arrival at TAMUQ impacted the faculty there?
>
> There was a change in general terms, we heard mostly from the engineers that his interactions were less responsive and less competent. Liberal Arts relied upon benign neglect; female faculty referred to having run into more difficulties. A former anthropologist Dr. Rico had noticed additional roadblocks related to her expenditure of research funding. Also the Women's Faculty Forum (WFF) mentioned having tried to put together a climate survey. They reported having run into roadblocks under Dean Malave. Also the instructional faculty shared they were running into problems regarding their retention.

61. After learning of Dr. Ura's report of sex discrimination towards Dr. Athreya, Dean Malavé tried to intimidate her into not coming forward.

62. On October 19, 2021, the same day Dr. Ura was removed, Dean Malavé called a meeting with the Liberal Arts program where he attempted to intimidate other faculty members by

belittling their fears of retaliation and by making deliberate and prolonged eye contact with Dr. Athreya while standing directly over her after she spoke in support of Dr. Ura. Witness statements obtained during the investigation corroborate what Dean Malavé did. According to one statement, "it was noticeable," and "more direct eye contact with her." According to another statement, "he made prolonged and intimidating eye contact with Dr. Athreya."

63. Since Dr. Athreya made her own complaint and filed a charge, TAMU has retaliated against Dr. Athreya.

64. Specifically, TAMU did this by slow walking any potential resolution to inflict the most pain and hardship on Dr. Athreya and her family.

65. The main remedy that Dr. Athreya desired was to have her contract renewed so that she could remain in Qatar. TAMU knew this.

66. During this time, Dr. Athreya's husband was diagnosed with an aggressive, terminal ailment that would require treatment during which he would not be able to travel. That meant that if TAMU would not agree to extend Dr. Athreya's contract, she and her family would have to move back to the United States before beginning that treatment.[2] TAMU knew this.

67. TAMU then deliberately refused to engage in any substantive discussions about extending the contract until Dr. Athreya had to make the decision to move back to the United States so her husband could get treatment. Only then, after her husband began treatment in the US, did TAMU offer to extend her TAMUQ contract by two years.

68. The fact that TAMU could offer that also puts the lie to reasons given by Dean Malavé for nonrenewing in the first place.

69. Dr. Athreya filed a Charge of Discrimination with the U.S. Equal Employment

---

[2] Dr. Athreya and her family could not stay in Qatar on their own because visas are tied to employment within the country. If she did not have a contract with TAMUQ, then she could not remain in Qatar.

Opportunity Commission on November 8, 2021. The EEOC issued a Notice of Right to Sue in relation to Dr. Athreya's Charge on April 7, 2023.

70. All conditions precedent to the bringing of this suit have been satisfied or have been fulfilled, as Plaintiff exhausted the necessary administrative remedies.

## V. TITLE VII SEX DISCRIMINATION BY DEFENDANT

71. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

72. As described above, Defendant's actions constitute unlawful discrimination on the basis of Plaintiff's sex in violation of 42 U.S.C. § 2000e-2(a). The employment practices complained of above were intentional.

73. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII.

74. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to lost wages and other benefits associated with her employment.

75. As a result of Defendant's discrimination, Plaintiff has suffered non-pecuniary losses including, but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

76. Additionally, Plaintiff seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful discrimination.

77. Defendant's actions referenced above have caused Plaintiff to retain the services of the undersigned counsel in order to pursue her federal rights in this action. Consequently,

Plaintiff seeks attorneys' fees, expert costs, and other costs of suit.

## VI. TITLE VII RETALIATION BY DEFENDANT

78. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

79. Plaintiff engaged in protected activity when she complained of sex discrimination.

80. Defendant's actions were undertaken because of Plaintiff's complaints of discrimination.

81. Defendant's actions were intentional and done with malice or reckless disregard.

82. Because of these actions, Plaintiff suffered damages within the jurisdictional limits of this court.

## VII. DAMAGES

83. WHEREFORE, Plaintiff respectfully requests that the above- named Defendant, be cited to appear in this matter and that, after jury trial by proof, she be awarded:

   i. Back pay, including but not limited to, lost wages, and other employment benefits;

   ii. Front pay, including but not limited to wages, and other employment benefits;

   iii. Judgment against Defendant for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

   iv. Actual damages;

   v. Injunctive or prospective relief, including training on sex discrimination

    and diversity awareness programs;

vi. Judgment against Defendants for Plaintiff's reasonable attorneys'and experts' fees; and costs of suit;

vii. Prejudgment and post-judgment interest as allowed by law; and

viii. Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled, as this court may deem proper.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Summons be issued, and that upon a trial on the merits Plaintiff be awarded the relief requested in this Complaint and such other and further relief to which she may be justly entitled.

Respectfully submitted,

*Jairo Castellanos*
Jairo Castellanos
Wiley Walsh, P.C.
Federal ID No. 3295275
State Bar No. 24089624
jairo@wileywalsh.com
1011 San Jacinto Blvd., Ste. 401
Austin, TX 78701
Telephone:     (512) 271-5527
Telecopier:    (512) 201-1263

Harjeen Zibari
Texas Bar No. 24117731
S.D. Texas Bar No. 3804111

ROB WILEY, P.C.
2613 Thomas Avenue
Dallas, TX 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511
hzibari@robwiley.com

ATTORNEYS FOR PLAINTIFF